IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-40780
_____

FRANKLIN JOHNSON,

                    Plaintiff-Appellee,

v.

GAMBRINUS COMPANY/SPOETZL BREWERY,

                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

June 25, 1997

Before KING, SMITH, and WIENER, Circuit Judges.

KING, Circuit Judge:

      The opinion entered in this cause on March 27, 1997,
reprinted at 109 F.3d 1040, is withdrawn, and the following
opinion is substituted therefor.

      Gambrinus Company/Spoetzl Brewery appeals the district
court's judgment and injunctive order entered after the district
court found a violation of the Americans with Disabilities Act
and Texas law when it refused to permit Franklin Johnson, who is
blind, to tour the Spoetzl Brewery with his guide dog.  Finding
no error, we affirm.

                         **I.  BACKGROUND**

The Gambrinus Company ("Gambrinus") owns the Spoetzl Brewery (the "brewery") in Shiner, Texas.  The brewery offers free daily public tours.  A brief description of the tour is necessary to understand the issues in this case.  The tour begins at the gift shop where tourists watch a video about the brewery.  After seeing the video, the tour group is guided through a long hallway and up a flight of metal stairs that leads to the brewhouse.  The tour then roughly traces the production process for Shiner Beer.

Tourists are not shown the beginning part of the brewing process where grain is mixed with water and then converted to wort.  Tourists first see the grant, which is a copper collecting vessel located in the brewhouse.  Wort passes through the grant on the way to the brewkettle.  At various times in the production process, the lid to the grant is open.  In the brewkettle, hops are added and the wort is brought to a boil.  Tourists are frequently permitted to look into the brewkettle with their faces directly over the surface of the wort.  When the boiling is finished, the wort is transferred to a settling tank and then moved through a cooler.  The liquid is then pumped into the cellars where yeast is added, and the wort is fermented for ten to twelve days.  Visitors are not permitted in this area.  After fermentation, the beer is cooled further and then filtered to remove the yeast.  The beer is then carbonated, and some of it is pasteurized.

After the tour group leaves the brewhouse, it enters a door leading to the bottling and canning line.  The tourists pass

2

within a few feet of both the bottling and canning lines.  From the can-filling area, the tourists are led to the keg room.  In the keg room, kegs are debunged (the plug is removed) and sanitized.  The kegs are then rolled down a conveyor into the racking room.  The tour group proceeds to the racking room, where the empty kegs are filled, sealed with a new bung, and stacked.  Tourists get so close to the keg filling operation that they are sometimes splashed with beer as the bungs are hammered in.  After leaving the racking room, visitors exit the brewery and are invited to sample beer in the hospitality room.

On July 8, 1993, Franklin Johnson and his guide dog visited the brewery, along with Johnson's friend Scott Bowman and Bowman's son, to take the tour.  During the video presentation at the gift shop, the tour guide, Bernadette Fikac, noticed that Johnson had a dog and called the brewmaster, John Hybner, to confirm the brewery's policy that no animals were allowed on the tour or in the brewery.  Hybner confirmed that the brewery had a blanket "no animals" policy, based on its interpretation of applicable Food and Drug Administration ("FDA") regulations. Fikac then informed Johnson that he would not be allowed to take the tour with his dog, but that he could take the tour with a personal human guide such as herself.  Johnson informed Fikac that he had a legal right to take the tour with his guide dog, but the brewery would not budge on its blanket no animals policy. Johnson declined to take the tour without his dog, and he waited outside while Bowman and his son took the tour.  Although Hybner

3

instructed Fikac to inform Johnson that he could visit the hospitality room, Fikac forgot to do so. However, the brewery's blanket no animals policy at that time applied to the hospitality room also.

On July 1, 1994, Johnson filed suit against Gambrinus, seeking relief under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, and Texas law. A bench trial was held on July 18 and 19, 1995. In its findings of fact and conclusions of law, the district court determined that Gambrinus's blanket no animals policy, which included service animals,[1] was not compelled by any law and violated the ADA. The court ordered Gambrinus "to modify or establish policies, practices, or procedures to ensure that disabled persons with guide dogs or other service animals have the broadest feasible access to the public tour of the Spoetzl Brewery consistent with the brewery's safe operation," to seek guidance from the Justice Department, and to submit to the court a written policy carrying out its order. Gambrinus timely appealed.

On appeal, Gambrinus makes several arguments. It asserts that the district court improperly placed upon it the burden of proving that allowing the dog on the tour was unreasonable, thereby refusing to consider its argument that allowing service

---

[1] The lower court, briefs, statutes, and literature use various terms to refer to guide dogs and other animals used for assistance by individuals with disabilities, such as "service animals," "assistance animals," and "support animals." In line with the language of the ADA regulations, we will use the term "service animals."

animals on the brewery tour would fundamentally alter the nature of the tour. Gambrinus also claims that "broadest feasible access" is merely a goal and not the appropriate legal standard to assess violations of the ADA concerning service animals in public accommodations. Gambrinus further argues that the district court erred in finding that allowing a guide dog on some parts of the tour would not violate FDA regulations. Finally, Gambrinus contends that it cannot be held liable for a state law violation when a federal statute, namely the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-395, mandates its actions. We reject each of these arguments, and we affirm the district court's judgment.

## II.  STANDARD OF REVIEW

We review the district court's legal conclusions de novo and its factual findings for clear error. *Joslyn Mfg. Co. v. Koppers Co.*, 40 F.3d 750, 753 (5th Cir. 1994). We must affirm the district court's factual findings "unless we are left with the firm and definite conviction that a mistake has been made." *Id.* at 761.

## III.  JURISDICTION

After this case was fully briefed, Johnson filed a motion to dismiss the appeal for lack of jurisdiction. Johnson contends that we have no jurisdiction over this appeal because there is no final judgment or final order, the order was not an appealable collateral order, and the district court did not fully adjudicate the rights and obligations of the parties. Before oral argument,

5

we denied that motion, and upon reconsideration we have determined that our initial decision was correct.  We make no comment on Johnson's specific arguments, instead concluding that we have jurisdiction under 28 U.S.C. § 1292 because the district court's order granted an injunction.[2]

> The district court's order reads as follows:

> Defendant is ORDERED to modify or establish policies, practices, and procedures to ensure that disabled persons with guide dogs or other service animals have the broadest feasible access to the public tour of the Spoetzl Brewery consistent with the brewery's safe operation.  As Defendant establishes or modifies its policies, practices, or procedures, it is hereby ORDERED to seek guidance from the United States Department of Justice in the form of a letter opinion or, if necessary, a formal or informal rulemaking.  In seeking guidance from the Justice Department, Defendant may request that the Justice Department consult with the United States Food and Drug Administration and the Occupational Safety and Health Administration. Defendant is further ORDERED to submit to the Court, as soon as practicable, a written policy governing support animal access to its public tour, incorporating whatever guidance the Justice Department provides.  The Court shall maintain continuing jurisdiction over Defendant to ensure that this policy is carried out and that disabled persons with support animals are afforded the broadest feasible access consistent with the safe operation of the Spoetzl Brewery.

The order, in effect, requires Gambrinus to make modifications to allow individuals with service animals the broadest feasible

---

[2]  Section 1292 provides in pertinent part:

(a)  Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

> (1)  Interlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . .

access to the tour, to consult with the Department of Justice in formulating these changes, and to submit a written policy to the district court as soon as practicable. This is very similar to the desegregation order in *Board of Pub. Instruction v. Braxton*, 326 F.2d 616 (5th Cir.), *cert. denied*, 377 U.S. 924 (1964). In *Braxton*, the lower court's order listed five types of prohibited acts, for example, "[c]ontinuing to operate a compulsory biracial school system," "[a]ssigning pupils to schools on the basis of race and color," and "[a]ssigning . . . personnel to schools on the basis of . . . race and color." *Id.* at 617 n.1. The order then indicated that the prohibitions would not go into effect immediately and required the defendants to submit "a detailed and comprehensive plan" to implement the prohibitions. *Id.* We held that the order was an appealable injunction, reasoning that "the ordering of the plan dealing expressly with these prohibited acts amounts to a mandatory injunction." *Id.* at 619. The order in the case at bar is similar, given that it prohibits an act (banning all service animals from the brewery tour) and orders Gambrinus to consult the Department of Justice and submit a written policy incorporating that guidance. Thus, we conclude that the order in this case is an appealable injunction under § 1292(a)(1). *See also Morales v. Turman*, 535 F.2d 864, 867 n.6 (5th Cir. 1976) ("[T]he order requiring that the parties meet and negotiate a plan complying with the decision is itself a mandatory injunction which is appealable under 28 U.S.C.

7

§ 1292(a)(1)." (citing *Braxton*)), *rev'd on other grounds*, 430 U.S. 322 (1977).

## IV.  STANDARDS OF PROOF UNDER THE AMERICANS WITH DISABILITIES ACT

Title III of the ADA, which applies to public accommodations,[3] establishes the general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  The ADA then defines discrimination to include

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

*Id.* § 12182(b)(2)(A)(ii).

The central issue for us to address in this case is the allocation of the burdens of proof in a "reasonable modifications" case under Title III.  Because no Fifth Circuit case sets forth these burdens in the context of Title III, we will look to the more fully developed case law under Title I of the ADA, which prohibits disability discrimination in employment.  *See id.* § 12112.

---

[3]  The parties do not dispute that the public tour and hospitality room are places of public accommodation.

In *Riel v. Electronic Data Sys. Corp.*, 99 F.3d 678 (5th Cir. 1996), the plaintiff brought suit under the ADA after he was fired for repeatedly failing to meet milestone deadlines on projects. *Id.* at 681. He claimed that his failure to meet those deadlines was caused by his disability, which was fatigue attributed to renal failure and diabetes, and he requested accommodations. *Id.* at 680-81. The district court granted summary judgment for the employer, in part by concluding that the plaintiff's requested accommodations were not reasonable. *Id.* at 680. We reversed and remanded. *Id.*

Title I of the ADA provides that discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). The *Riel* court noted that the statutory language, by requiring a reasonable accommodation unless the employer "can demonstrate" undue hardship, clearly placed the burden of proof with respect to undue hardship on the employer. 99 F.3d at 682. As to the burden of proving the reasonableness of the accommodation, the court noted that "[i]n contrast, discrimination is defined to be a 'failure to implement reasonable accommodations,' suggesting that the plaintiff bears the burden of proof on that issue." *Id.* The court went on to describe the substance of these burdens: "[A] reasonable accommodation is 'a method of accommodation that

9

is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's] operations.'"  *Id.* at 683 (quoting *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993), *cert. denied*, 114 S. Ct. 1538 (1994)) (alteration in original).  Thus, a plaintiff meets the burden of proof on reasonableness by proposing and putting forth evidence of an accommodation that is generally reasonable, or reasonable "in the run of cases."  The employer can challenge the reasonableness of the accommodation only by evidence showing that the accommodation generally would not be reasonable.  Moving on to the affirmative defense, if the employer introduces evidence that disputes the appropriateness of the accommodation in the specific circumstances, that constitutes evidence of undue hardship (on which the employer bears the burden of proof).  The *Riel* court held that an employer's only mechanism for challenging a requested accommodation (that is reasonable in the run of cases) on grounds that are specific to the circumstances is through the undue hardship defense.  *Id.* at 683-84.

The plaintiff in *Riel* requested that his employer accommodate him either by transferring him to a position without milestone deadlines or by adjusting the deadlines for him.  *Id.* at 683.  The employer argued that relaxing the milestone deadlines would disrupt its work structure.  *Id.*  The court concluded that there was a fact issue on that question and accordingly determined that summary judgment was inappropriate.

10

*Id.* The employer also argued that its internal polices would not allow it to transfer the plaintiff because the plaintiff had received ratings of "below average" as a result of missing milestone deadlines. *Id.* The court concluded that this evidence focused upon the plaintiff's specific circumstances and thus could not be used to rebut the plaintiff's showing of an accommodation reasonable in the run of cases, but instead was relevant only to meeting the employer's burden of showing undue hardship. *Id.* at 683-84. The employer, however, did not plead undue hardship, which is an affirmative defense. *Id.* at 684. The employer's evidence therefore was not sufficient to show that it was entitled to judgment as a matter of law and that there were no genuine issues of material fact. *Id.*

While *Riel* was a Title I reasonable accommodations case, its analysis is easily transferrable to the Title III reasonable modifications context. The language of both provisions is very similar: Title I defines discrimination to include "not making reasonable accommodations . . . unless [the defendant] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Title III defines discrimination to include "a failure to make reasonable modifications . . . unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the public accommodation]." *Id.* § 12182(b)(2)(A)(ii). In light of the statutes' parallel language, we find no basis for distinguishing their respective burdens of proof. While Title I

11

provides an undue hardship defense and Title III provides a fundamental alteration defense, fundamental alteration is merely a particular type of undue hardship. *See* 29 C.F.R. pt. 1630 app., § 1630.2(p). Consequently, while the scope of the affirmative defense under Title III is more narrow than that provided by Title I, the type of proof -- that is, proof focusing on the specific circumstances rather than on reasonableness in general -- is the same.

Applying the *Riel* framework to the Title III reasonable modifications context yields the following allocation of burdens of proof. The plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable. The plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases. While the defendant may introduce evidence indicating that the plaintiff's requested modification is not reasonable in the run of cases, the plaintiff bears the ultimate burden of proof on the issue. *See also Staron v. McDonald's Corp.*, 51 F.3d 353 (2d Cir. 1995) (reversing the district court's Rule 12(b)(6) dismissal of Title III suit based on district court's determination that plaintiffs' requested accommodations are not reasonable as a matter of law and remanding to give plaintiffs the opportunity to prove that the requested accommodations are reasonable).[4] If the

_____

[4] The Rehabilitation Act is the predecessor to the ADA, and Rehabilitation Act precedent is to be used in interpreting the ADA. *See, e.g.,* 56 Fed. Reg. 35544, 35545 (1991). However, we

12

plaintiff meets this burden, the defendant must make the requested modification unless the defendant pleads and meets its burden of proving that the requested modification would fundamentally alter the nature of the public accommodation.[5] The type of evidence that satisfies this burden focuses on the specifics of the plaintiff's or defendant's circumstances and not on the general nature of the accommodation. Under the statutory framework, such evidence is relevant only to a fundamental alteration defense and not relevant to the plaintiff's burden to

have not been consistent in our interpretation of the Rehabilitation Act regarding the burden of proof on reasonableness. *Compare McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850 (5th Cir. 1993) (concluding that in a Rehabilitation Act case concerning higher education, plaintiff had the burden to prove that his requested accommodations were reasonable), *cert. denied*, 510 U.S. 1131 (1994), *with Prewitt v. United States Postal Serv.*, 662 F.2d 292 (5th Cir. Unit A Nov. 5, 1981) (concluding in a Rehabilitation Act case involving employment discrimination that the employer has the burden of persuasion on the issue of reasonable accommodation). The analysis in *Riel* is much more similar to *McGregor* than *Prewitt*, and thus we will continue to follow that path.

[5] This analysis applies under the facts and arguments presented in this case. In this case, the parties agreed that some modification to tour procedures was "necessary," satisfying that element of the statute. Additionally, Gambrinus's argument depends upon its claim that FDA regulations prohibited all animals on the brewery tour. We conclude in Part V *infra* that Gambrinus's argument is flawed because the FDA regulations do not compel Gambrinus's no animals policy; this removes the basis for Gambrinus's proposed modification, thereby effectively eliminating it as an alternative proposed modification and leaving only Johnson's proposal for analysis. In a different case with competing proposed modifications, a different analysis could control the plaintiff's burden of proving that the defendant "fail[ed] to make reasonable modifications . . . when such modifications are necessary." Indeed, had Gambrinus argued that its modification of a personal human guide was reasonable, even in the absence of the FDA regulations, our analysis could have been different.

13

show that the requested modification is reasonable in the run of cases.

Service animals present potential concerns not encountered with other types of personal assistance mechanisms for individuals with disabilities.  The Justice Department, which Congress directed to issue regulations to carry out the provisions of Title III, 42 U.S.C. § 12186(b), has promulgated a regulation and commentary discussing the use of service animals in places of public accommodation.  The regulation states: "Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability."  28 C.F.R. § 36.302(c)(1).  In its interpretive commentary, the Justice Department has stated as follows:

> Section 36.302(c)(1) of the final rule now provides that "[g]enerally, a public accommodation shall modify policies, practices, and procedures to permit the use of a service animal by an individual with a disability."  This formulation reflects the general intent of Congress that public accommodations take the necessary steps to accommodate service animals and to ensure that individuals with disabilities are not separated from their service animals.  It is intended that the broadest feasible access be provided to service animals in all places of public accommodation, including movie theaters, restaurants, hotels, retail stores, hospitals, and nursing homes. The section also acknowledges, however, that, in rare circumstances, accommodation of service animals may not be required because a fundamental alteration would result in the nature of the goods, services, facilities, privileges, advantages, or accommodations offered or provided, or the safe operation of the public accommodation would be jeopardized.

28 C.F.R. pt. 36 app. B, at 623 (alteration in original) (citations omitted).  This Justice Department interpretation fits

14

well within the *Riel* framework. Under the *Riel* framework, the plaintiff must show a modification that is reasonable generally or in the run of cases. The regulation and commentary reflect an administrative determination that modifying a no animals policy to allow a service animal full access with its owner in a place of public accommodation is generally reasonable, or, in *Riel* language, reasonable in the run of cases. The commentary also mirrors the *Riel* framework by stating that a public accommodation must modify its animal restriction policy to allow a service animal to accompany its owner unless it can demonstrate that such modifications would cause a fundamental alteration or jeopardize the safety of the public accommodation.

Congress has specifically directed the Justice Department to issue regulations implementing Title III. *See* 42 U.S.C. § 12186(b). In reviewing such regulations, we must first determine whether the statute has "directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984). We agree with the district court in this case that Title III of the ADA does not explicitly address the issue of who bears the burden of proving the reasonableness of allowing service animals in places of public accommodation. Next "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The agency's construction does not have to be the only permissible

15

reading of the statute. *Id.* at 843 n.11. "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

We agree with the district court that the Justice Department's interpretation is not arbitrary, capricious, or manifestly contrary to the statute. As previously discussed, the regulation corresponds with the ADA's statutory framework as discussed in *Riel*. Furthermore, the legislative history of Title III makes clear that Congress concluded that it is a reasonable modification for places of public accommodation with animal restriction policies to allow individuals with disabilities full use of service animals.[6] We also defer to the Justice

---

[6] The legislative history of the ADA contains many statements regarding the use of service animals in places of public accommodation. The Education and Labor Committee indicated that public accommodations should modify their operations to allow service dogs:

> A public accommodation which does not allow dogs must modify that rule for a blind person with a seeing-eye dog, a deaf person with a hearing-ear dog, or a person with some other disability who uses a service dog. Refusal to admit the dog in these circumstances is tantamount to refusing to admit the person who is in need of the dog. Moreover, a public accommodation may not require the person with the disability to be separated from the service, guide, or seeing-eye dog once inside the facility.

H.R. REP. No. 485(II), 101st Cong., 2d Sess. 106 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 389. Indeed, the Judiciary Committee specifically listed changing a "no pets" policy for the use of service animals as an example of a reasonable modification, stating that the refusal to modify such a policy is discriminatory:

> It is discriminatory to fail to make reasonable

16

Department's commentary concerning service animals because it is not inconsistent with the plain language of the regulation.  *See WRT Energy Corp. v. Federal Energy Regulatory Comm'n*, 107 F.3d 314, 317-18 (5th Cir. 1997) (citing *Thomas Jefferson Univ. v.*

---

modifications in policies and practices when such modifications are necessary to provide goods or services, unless it can be demonstrated that the modifications would fundamentally alter the nature of the goods or services provided.

For example, it is discriminatory to refuse to alter a "no pets" rule for a person with a disability who uses a guide or service dog.

H.R. REP. No. 485(III), 101st Cong., 2d Sess. 59 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 482.  Similar sentiments were expressed in the *Congressional Record*.  For example, Senator Simon stated as follows:

One form of discrimination faced by thousands of people with disabilities in public accommodations is prohibiting entry by an assistive animal.  Part of the problem lies in ignorance. . . . Regretfully, many people still don't understand that these animals are well-trained and certified, and don't create public disturbances nor pose any public health risk whatsoever.  Generally speaking, any facility where it is safe for a person to go, it is safe for a trained assistive animal to go, including restaurants and other public accommodations. . . .

It should be further understood that a person with a disability using a guide, signal or service dog should not be separated from the dog. . . . A person with a disability and his or her assistive animal function as a unit and should never be involuntarily separated.  Nor is there any need for this separation. To require it would be discriminatory under the Americans with Disabilities Act.

135 CONG. REC. S10,800 (1989).  Representative Hoyer, when speaking of reasonable modifications under Title III, expressed that "it would be discriminatory for a restaurant to refuse to alter a 'no pets' rule for a person who uses a guide or a service dog, because such an alteration would not fundamentally alter the nature of the goods being provided."  136 CONG. REC. E1919 (1990).

*Shalala*, 512 U.S. 504 (1994)) (giving deference to FERC's interpretations of its regulations).[7]

Before discussing the application of the burdens of proof in this case, it is necessary to examine the relevant FDA regulations and the district court's findings regarding those regulations.

## V. THE FOOD, DRUG, AND COSMETIC ACT

The Food, Drug, and Cosmetic Act governs, among other things, the manufacturing of food to prevent adulteration. 21 U.S.C. § 342. The regulations implemented pursuant to the Food,

---

[7] Gambrinus argues that the "broadest feasible access" language in the commentary is merely a goal, not a legal rule. Gambrinus insists that having a broadest feasible access standard is inconsistent with the wording of the statute because broadest feasible access is a "do or die" standard whereas the text of the statute mandates only reasonable modifications. Contrary to Gambrinus's assertions, a broadest feasible access standard is not a do or die standard in contradiction to the reasonable modification requirement, but merely an explanation of what is reasonable in this context. Under the *Riel* framework, the plaintiff's proposed modification must be reasonable in the run of cases. The administrative agency charged with interpreting the statute, aided by clear legislative history, has determined that allowing the broadest feasible access for service animals to accompany their owners in places of public accommodation is reasonable. This is not a do or die standard, for in the "rare circumstance[]" that allowing service animals would fundamentally alter the nature or jeopardize the safety of the public accommodation, the public accommodation would not be required to make the modification.

However, even in such a rare circumstance, the public accommodation must designate the exact areas where exclusion is appropriate. *Letter from Turner*, 4 NAT'L DISABILITY L. REP. 185 (May 10, 1993) (discussing the use of service animals in hospitals). This is consistent with the broadest feasible access requirement and with the general requirement under Title III that "[g]oods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual." 42 U.S.C. § 12182(b)(1)(B).

18

Drug, and Cosmetic Act controlling manufacturing processes state that "[g]uard or guide dogs may be allowed in some areas of a plant if the presence of the dogs is unlikely to result in the contamination of food, food-contact surfaces, or food-packaging materials." 21 C.F.R. § 110.35(c). Gambrinus claims that this FDA provision requires its blanket no animals policy because it has an open manufacturing system and the tour passes by places where the beer or the beer packaging is exposed to air, thereby risking contamination. Of the various types of contamination, Gambrinus is mostly concerned with physical contamination -- *i.e.*, dog hair in the beer.

Gambrinus is particularly worried about physical contamination at "critical control points" in the manufacturing process. A critical control point is a point "where there is a high probability that improper control may cause, allow, or contribute to a hazard or to filth in the final food." *Id.* § 110.3(e). Gambrinus asserts that there are at least five critical control points on the tour, namely:

- the grant, through which wort flows as the brewkettle is filled and which must remain open whenever wort flows through it;

- the lip of the brewkettle, which is exposed to air when brew flows through;

- the lid of the brewkettle, which must be opened to check the consistency of the beer and is opened for tourists so they can see the beer being processed;

19

.    the bottle and can filling stations, in which unsealed

containers are exposed to open air; and

.    the keg sealing area, where unsealed kegs and bungs are

exposed to air before the kegs are refilled and sealed.

The district court made findings indicating that because contamination was unlikely at several of these points, the FDA regulation did not compel Gambrinus's blanket no animals policy. Gambrinus claims those findings constitute clear error. After reviewing the evidence and the district court's findings, we conclude that the district court did not commit reversible error.

The district court made two types of findings regarding the likelihood of contamination. First, the district court examined the risk of contamination presented by a guide dog versus the risk of contamination presented by the tourists. All parties agree that in the entire history of the brewery, there have only been three known visits by guide dogs and only one known request to take a guide dog on a tour. By contrast, over 5800 tourists visit the brewery annually. The district court found that guide dogs are groomed daily and likely to shed less hair than dogs that are not groomed daily. By contrast, the tourists are not required to wear any hair or beard covering, even though tourists often put their faces directly into the opening of the brewkettle. Based on these findings, the district court concluded that

> [t]he marginal increase in contamination risk
> associated with over 5,000 annual human visitors to the
> Spoetzl Brewery is greater than the marginal increase
> in contamination risk associated with the maximum

20

foreseeable number of annual guide dogs visits by at least an order of magnitude.  More likely than not, these risks differ by several orders of magnitude.

Gambrinus claims that the contamination risk posed by humans is irrelevant because the FDA regulation specifically targets guide dogs.  However, Gambrinus's own expert (R.D. Sowards from the Texas Department of Public Health, the agency that enforces FDA regulations in Texas) admitted under cross-examination that an inspector would consider all the circumstances, including the exposure risk posed by the tourists, in determining whether to cite the brewery.  The evidence also showed that the Texas Department of Public Health has been aware for some time that the brewery conducts public tours but has never issued a citation to the brewery based on the contamination risk from the tourists. Hybner testified that in the twenty-three years that he has been brewmaster, he has never heard of a hair in Shiner beer.  From this evidence, the district court did not clearly err in determining that "[t]he Texas Department of Public Health will not issue a citation to the Spoetzl Brewery if, consistent with the Americans With Disabilities Act, the Spoetzl Brewery permits disabled persons to take their guide dogs on some parts of the brewery tour, subject to specific limitations that make contamination unlikely."

Second, the district court made other findings based not on relative contamination risk but on the risk of contamination posed by the presence of a guide dog alone.  The district court determined that contamination is "unlikely -- virtually

21

impossible -- at the Spoetzl Brewery if a guide dog is permitted to enter the hospitality room." Gambrinus apparently agrees with this conclusion, given that it has already changed its policy to allow guide dogs into the hospitality room.[8] The district court also found that contamination was "unlikely -- virtually impossible" if a guide dog is permitted in the stairs leading to the brewhouse. Gambrinus does not contest this finding either.[9]

The district court made further findings implying that any part of the production occurring before the boiling and filtering process could be exposed to a guide dog because the boiling and filtering would remove any possible contaminants. The district court noted that Gambrinus's experts did not comment on the likelihood of physical contamination (hair in the beer) if the prefiltered wort were exposed to a guide dog, and the district

---

[8] The district court found that at the time of the tour, Johnson was welcome in the hospitality room only without his guide dog. Gambrinus claims it could not have discriminated against Johnson because Johnson did not request to visit the hospitality room. However, the district court found (from clear evidence in the record, including Hybner's own testimony) that Gambrinus's blanket no animals policy at that time included the hospitality room. No one disputes that the standard tour procedure was to invite the tourists to the hospitality room at the end of the tour, and Gambrinus never invited Johnson to enter the hospitality room. The district court did not err in finding that Gambrinus discriminated against Johnson through its policy of conditioning admittance to the tour, including the hospitality room, on Johnson not bringing his guide dog.

[9] Gambrinus claims that the fact that there is no contamination risk in the stairs is irrelevant because the public accommodation is the tour, not the stairs leading to a part of the tour. The finding is relevant, however, in demonstrating areas in the building in which a guide dog would not present a risk of likely contamination, which is pertinent in planning a potential alternative tour route that does not make contamination likely.

court found that the liquid in the grant and subsequently in the brewkettle would be filtered. Thus, Gambrinus failed to make an adequate showing that it would be in violation of FDA regulations to allow a guide dog on the early portions of the tour where tourists see the wort flowing through the grant and peer into the brewkettle.

The district court found that contamination in the bottle filling station was unlikely because presealed bottles are behind glass and tourists are only directly exposed to sealed, capped bottles. Gambrinus argues that this finding is clearly erroneous because the glass barrier was not in place on July 8, 1993 when Johnson wanted to tour the brewery. The evidence in the record shows that the glass was not in fact in place on that date, and thus the district court did commit clear error. This error does not mandate reversal because the district court's order can be upheld based upon the findings of other places on the tour where a guide dog does not present a likelihood of contamination. Furthermore, the finding that a glass barrier could reduce the likelihood of contamination tends to indicate that other modifications could possibly be made to eliminate any risk of contamination.[10]

---

[10] Gambrinus argues that the glass barrier in place does not fully protect the area from contamination exposure because it does not reach the ceiling and covers only part of the area. Even if this contention is correct, it shows that Gambrinus can conceive of types of glass barriers that could make contamination unlikely.

The gist of Gambrinus's argument is that there is no evidence to show that a guide dog could go on any part of the tour without creating a likelihood of contamination. Gambrinus repeatedly points to evidence in the record where its experts make sweeping statements about guide dogs in a place like the brewery, but Gambrinus ignores the evidence to the contrary, most of which was elicited on cross-examination. After reviewing all of the evidence, we are not left with a definite and firm conviction that the district court made a mistake in finding that a guide dog could go on parts of the tour without presenting a likelihood of contamination and thus Gambrinus's blanket no animals policy is not compelled by the FDA regulation.

## VI.  APPLICATION OF ADA STANDARDS IN LIGHT OF THE FDA FINDINGS

After analyzing the district court's interpretations and findings regarding the FDA regulation, we now turn to a discussion of whether each party has met its burdens under the ADA.

As previously stated, Johnson has the burden to show that he requested a modification that is reasonable in the run of cases. Johnson has met that burden:  he requested a modification of Gambrinus's blanket no animals policy to allow full access for his guide dog in Gambrinus's place of public accommodation. As indicated in the Justice Department's regulation and commentary, this modification is generally reasonable.[11]

---

[11]  Gambrinus agrees that the burden to prove reasonableness is on Johnson but argues that this burden also requires Johnson to prove that there are no obstacles to full access, such as the

24

Thus, as established by *Riel* and the Justice Department regulation and commentary, Gambrinus must make modifications to allow guide dogs on the tour unless it can demonstrate either 1) that such modifications would fundamentally alter the nature of the public accommodation or 2) that such modifications would jeopardize the safety of the public accommodation.[12] Gambrinus has failed to make such a showing.

Gambrinus argues that it is not required to allow guide dogs on the tour because it would either require Gambrinus to violate the FDA regulation or to shut down beer production while a dog was present to avoid exposure. According to Gambrinus, shutting down the production process would fundamentally alter the nature of the tour, which is to see beer actually being made. However, as we have previously discussed, Gambrinus's interpretation and application of the FDA regulation are flawed because the district court did not err in finding that there are parts of the tour

---

FDA regulation. However, the fact that FDA regulations apply to a particular public accommodation shows only that in Gambrinus's unique circumstances there may be a barrier to full access for service animals. That type of evidence is irrelevant to Johnson's burden to show that his requested accommodation is reasonable in the run of cases, but instead is relevant only to Gambrinus's affirmative defenses, on which it bears the burden of proof.

[12] Because we have concluded that the FDA regulation did not mandate Gambrinus's blanket no animals policy, the asserted justification for its proposed modification -- a human escort -- disappears. Thus, our discussion assumes only one proposed modification (the plaintiff's), and we make no comment on the situation in which there are two competing proposed reasonable modifications.

where a guide dog could go without a likelihood of contamination and thus without violating the FDA regulation.

Gambrinus further complains that the district court erred by "not considering" its fundamental alteration argument. However, a reading of the district court's findings of fact and conclusions of law reveals that the district court found that "[a] modification to provide Plaintiff and his support dog the broadest feasible access to the public tour of the Spoetzl Brewery consistent with the safe operation of its manufacturing facilities will not work a fundamental alteration of the nature of the goods, services, facilities, privileges, or accommodations offered or provided." Gambrinus complains that this finding is clearly erroneous because the district court could not assess whether any modifications would cause a fundamental alteration when the exact nature of the changes to be made is still uncertain. Basically, Gambrinus is arguing that the district court had a duty to delineate the exact nature of the changes Gambrinus must make before it could conclude that Gambrinus had violated the ADA. The district court had no such duty because Johnson met his burden of showing that modification of a blanket no animals policy is reasonable in the run of cases and therefore Gambrinus must make the modification unless it can demonstrate an affirmative defense. As previously discussed, the district court found many areas of the tour where a guide dog could be present without a likelihood of contamination. It was not clearly erroneous to determine that a modification to allow service

26

animals on those parts of the tour would not result in a fundamental alteration. Findings concerning fundamental alterations relating to other modifications will come later. As Gambrinus acknowledges, the district court contemplates further action in this case. The court's order requires Gambrinus to submit a plan for the court's approval that provides "the broadest feasible access consistent with the safe operation" of the brewery.[13] In an order concerning attorneys' fees entered after the findings of fact and conclusions of law, the court noted that additional time may be expended litigating this case. Gambrinus will have the opportunity to make further arguments relating to fundamental alterations and safety of the brewery in whatever proceedings occur when it submits its policy governing service animal access. Although we have jurisdiction to consider this appeal, this litigation is not over.

## VII. TEXAS LAW

Texas law specifically prohibits excluding a blind person from any public facility because of that person's use of a service dog:

---

[13] The district court framed its order in terms of the safe operation of the brewery. The Justice Department's ADA commentary addresses the safety of the public accommodation, which in this case is the tour. When the district court refers to the safe operation of the brewery, it is not applying the Justice Department's commentary but is intending to encompass within this inquiry the FDA regulation and the risk of contamination to the brewery. We read this as the district court's reconciliation of the potentially conflicting demands of the FDA regulation and the ADA in this context. Only if this proves to be impossible will the analysis compelled by *Morton v. Mancari*, 417 U.S. 535, 550 (1974), be required.

27

> No person who is blind or physically handicapped may be denied admittance to any public facility in the state because of the blind or handicapped person's use of a white cane, assistance dog, wheelchair, crutches, or other device of assistance in mobility, or because the person is blind or handicapped.

TEX. HUM. RES. CODE ANN. § 121.003(c) (Vernon Supp. 1997). This prohibition is "[s]ubject only to limitations and conditions established by law and applicable alike to all people." *Id.* § 121.003(a). A violation subjects a defendant to a minimum of $100 in damages. *Id.* § 121.004.[14] The trial court found that the brewery's refusal to admit Johnson without his dog violated the statute and awarded Johnson $100.

Gambrinus claims that it cannot be found to have violated the Texas statute because its refusal to allow Johnson's dog on the tour was required by the FDA regulation. The district court disagreed and determined that Gambrinus's blanket no animals policy violated the Texas statute because the dog could go on parts of the brewery tour without violating the FDA regulation. We have already concluded that the district court's determination that Gambrinus's blanket no animals policy was not established by the FDA regulation was correct, and therefore we affirm the district court's finding of liability and award of $100 to Johnson.

### VIII. CONCLUSION

For the foregoing reasons, we AFFIRM.

---

[14] After the trial court's judgment, the Texas Legislature amended the statute to provide minimum damages of $300.

28