**Nancy AXELROD and Nicholas Axelrod Panagopoulos, Plaintiffs,**

**v.**

**PHILLIPS ACADEMY, ANDOVER, Defendant.**

**Civ. A. No. 99–10054–EFH.**

United States District Court, D. Massachusetts.

April 12, 1999.

Marc Redlich, Merle Ruth Hass, Law Offices of Marc Redlich, Boston, MA, for plaintiffs.

Douglas F. Seaver, Hinckley, Allen & Snyder, Philip Burling, Foley, Hoag & Eliot LLP, Boston, MA, for defendant.

## MEMORANDUM

HARRINGTON, District Judge.

Plaintiffs, Nicholas Axelrod Panagopoulos and Nancy Axelrod, Nicholas' mother, have brought this suit against Phillips Academy, Andover ("Phillips Academy"), claiming that Phillips Academy violated state and federal laws against disability discrimination and breached its contract with the plaintiffs by expelling Nicholas after the first trimester of his senior year. On February 16, 1999, this Court issued a preliminary injunction, ordering Phillips Academy to readmit Nicholas,[1] and set the case for an early bench trial on March 15, 1999. Although the plaintiffs had asserted several state and federal claims, the sole issue tried at this time was whether the Court would issue a permanent injunction under Title III of the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12182. Because of the necessity of an expeditious decision, the Court issued an order on March 30, 1999, after a nine-day trial, denying plaintiffs' Motion for Permanent Injunction and reinstating Phillips Academy's action requiring Nicholas to withdraw. The Order of March 30, 1999 reads in part:

> The Court finds that, even with the reasonable accommodations he received, Plaintiff Panagopoulos did not perform

certain required academic assignments in a timely and satisfactory manner and failed to make the necessary effort to do so. Nicholas was not required to withdraw because he *appeared* not to be doing his school work; rather, he was required to withdraw because he was not doing his school work. Courts have neither the authority nor the expertise to prescribe academic standards. The setting of such standards is within the absolute purview of the educators and the schools; and Phillips Academy has quite properly set high academic standards for its students.

> The Court finds that under the facts of this case Plaintiff Panagopoulos' ADHD [Attention Deficit/Hyperactivity Disorder] does not justify his failing to perform his required academic assignments and to adhere to the standards of a student at Phillips Academy. Plaintiff Panagopoulos has failed to meet those standards, not because of an inability to perform due to his ADHD, but rather because of a willful lack of effort on his part, invariably excused by a parent who indulged his lack of discipline and who failed to support the school in its efforts to assist him to do his work.

This Memorandum explains the Court's decision.

### Overview

Phillips Academy required Nicholas to withdraw following the Fall Term of 1998, the first trimester of his senior year, because Nicholas failed to meet the conditions of General Warning, a type of academic probation. In the Fall Term, Nicholas earned an unsatisfactory effort grade in one class, had poor grades in two classes, and had unfavorable reports from his teachers. The plaintiffs contend that Phillips Academy did not sufficiently accommodate Nicholas' Attention Deficit/Hyperactivity Disorder ("ADHD"), and that he was required to withdraw because

---

1. *Axelrod, et al. v. Phillips Academy, Andover,* ·1999 WL 80948.

of his ADHD, in violation of the ADA. The Court finds that Phillips Academy did make reasonable accommodations for Nicholas' ADHD and that Nicholas was required to withdraw because of his unwillingness to do his assigned work. The evidence at trial showed that throughout Nicholas' tenure at Phillips Academy, he consistently had difficulty meeting the academic standards of the school, and that Phillips Academy continually offered assistance, which Nicholas refused to accept.

*Freshman Year (1995–1996)*

From the outset, Nicholas had difficulty meeting the academic requirements of Phillips Academy. In his first trimester at Phillips Academy, Nicholas earned a "1" in Latin I and a "2" in Introduction to Chemistry.[2] On October 18, 1995, Phillips Academy placed Nicholas on Academic Restriction for three weeks, during which time Nicholas was required to be in his room by 8 p.m. on evenings that preceded a class day.

When a student experiences academic difficulties, Phillips Academy has a series of progressively more stringent academic restrictions it can impose to warn a student that improvement is necessary and, hopefully, to assist the student in focusing on his academic work. These restrictions are outlined in the Blue Book, which sets forth Phillips Academy's academic goals and expectations. The Blue Book is given to all students and is incorporated as part of their enrollment agreements. The first of these restrictions is "Academic Restriction," which is imposed when "a student's work might be improved by less distraction" and requires the student to be in his room by 8 p.m. on each evening preceding a class day for the duration of the restriction.

In more serious cases, Phillips Academy may place a student on "No Excuse" for a period of at least five weeks. While on "No Excuse" a student is restricted to school bounds (essentially the town of Andover). At the end of a trimester if a student's work remains precarious, the full faculty of Phillips Academy may vote to place the student on "General Warning," which "signifies that unless there is significant improvement, the student may be advised or required to withdraw at the end of the next trimester." If the faculty finds that a student is unable to meet the demands of Phillips Academy, it may advise the student to withdraw. A vote for "Advise to Withdraw" indicates that the faculty "will a most certainly require withdrawal unless substantial improvement is made in the subsequent trimester." The final step Phillips Academy can take is "Require to Withdraw." This step is taken when the faculty is convinced a student "is unable to meet the academy's academic standards." Over the course of his tenure at Phillips Academy, Nicholas had been placed on all of the academic restrictions outlined in the Blue Book.

Based on Nicholas' Fall Term grades, Nicholas was placed on Academic Restriction for the first two weeks of the Winter Term. He performed better this trimester, receiving only one "2." In the Spring Term, however, Nicholas' performance retrogressed; he earned a "1" in Chemistry and a "U" for effort in Theater Basics because he *attended only one* of the classes all term. At the end of the year, Andrew Cline, Nicholas's cluster[3] dean during his freshman year, wrote to Nicholas, telling him that his teachers were unanimously unimpressed with his effort and that in his first year at Phillips Academy Nicholas had given the impression of "someone who is inclined to be pretty easy

---

2. Phillips Academy uses numerical grades ranging from 0–6: 0 indicates "Serious Failure," 1 indicates "Failure," 2 indicates "Minimum Pass," 3 indicates "Satisfactory," 4 indicates "Good," 5 indicates "Superior," and 6 indicates "Outstanding."

3. Phillips Academy is divided into six clusters, with several dorms comprising a cluster.

on himself—long on excuses and short on follow through." Dean Cline asked Nicholas and Ms. Axelrod to seriously consider whether Phillips Academy was the right school for Nicholas.

Echoing Dean Cline's comments, Vincent Avery, the Dean of Studies and Nicholas' House Counselor, sent Ms. Axelrod a letter suggesting that Phillips Academy was probably not the right school for Nicholas. Dean Avery wrote:

> It is simply sad to see such talent lying fallow, and to see the warm, generous and witty personality shrouded from view, hiding from responsibilities. It is possible that I may be wrong, that some combination of factors will provide the spark to wake him into some different state of mind. It is equally possible that Nick himself will reach the same conclusion and find a way to leave. A third scenario, least appealing of all, features another three years of lackluster academic performance and minimal accommodation to expectations. I wish I could be more upbeat about the situation but I cannot find the evidence to support such a position. I vigorously urge you to talk with Nick about these concerns and about whether he is able to muster the energy and commitment necessary for him to prosper here.

Despite this warning Nicholas returned to Phillips Academy for his Sophomore year, and, as forecast, Nicholas' academic performance remained poor.

### Sophomore Year (1996–1997)

Nicholas' grades improved in the Fall Term, but in the Winter Term, Nicholas failed math. Phillips Academy offered Nicholas assistance in improving his study skills. Nancy Brother, the Director of Academic Counseling, scheduled regular meetings with Nicholas to review his study skills. Nicholas came to the first two meetings and then stopped coming. Midway through the Spring Term, Nicholas was placed on No Excuse because he was in danger of failing math, Spanish, and physics. Although Nicholas managed to earn "2"s in these three classes, in June 1997, the full faculty formally advised Nicholas to withdraw. Ruth Quattlebaum, interim cluster dean, wrote to Nicholas:

> Unfortunately, your teachers and counselors feel that you have made insignificant progress in turning around your previously poor academic record and you have five unexcused absences; in fact, some adults in this community do not think that this is the right school for you. Therefore, we are advising you to Withdraw from Phillips Academy .... unless there is a big change when you return, the cluster will eventually have to require you to withdraw.

Members of the faculty believed that Nicholas' academic problems were compounded by the fact that he did not appear to have a realistic view of his situation. Mr. Peter Merrill, Nicholas' House Counselor, wrote to Ms. Axelrod:

> Nick, I suspect, will protest this assertion, but he needs to read carefully what his teachers write about his performance. Report after report talks about his failure to prepare adequately on a daily basis. Yet in conversation after conversation this year, Nick continuously assured me that he was, in fact, doing all of his homework, but that unexplainable things kept getting in the way of his success. I believe that Nick believes what he says, but am convinced that he needs substantial help in assessing his own efforts more realistically.

### Summer 1997

Following the faculty vote, Dean Avery recommended to Ms. Axelrod that Nicholas see Dr. Larry Seidman about assessing Nicholas' Attention Deficit/Hyperactivity Disorder ("ADHD") and determining whether it was contributing to his academic problems at Phillips Academy. Nicholas had been diagnosed with mild ADHD at the age of five. Dr. Seidman is an Associate Professor of Psychology at Harvard Medical School who treats pa-

tients with ADHD. Dr. Seidman conducted a battery of tests, testing Nicholas' intelligence, attention, planning, memory, vision, and language skills. Based on the diagnostic criteria found in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-4"), Dr. Seidman concluded that Nicholas had ADHD and prepared a report, which he sent to Dean Avery. This report concluded that Nicholas has ADHD, has problems with language, and has poor penmanship.

Dr. Seidman's report suggested several recommendations to improve Nicholas' academic performance. Specifically, it recommended:

1. A review of Nicholas' medication

2. Psychotherapy

3. One-on-one instruction whenever possible

4. Regularly scheduled study time, rather than last minute cramming

5. Breaking larger projects into smaller projects

6. Pairing interesting tasks with those that are less interesting

7. A distraction free study environment

8. Being flexible with goals, recognizing there will be periods of resistance to work

9. Immediate feedback on school assignments

10. Untimed tests

11. A waiver of the foreign language requirement

Dr. Seidman testified, and the Court accepts, that ADHD affected Nicholas' abilities to organize, memorize, and pay attention: "Staying on task is the cardinal problem of persons with ADHD." Dr. Seidman's therapy notes indicate that Nicholas was puzzled by his inability to buckle down to do the school work.

Dr. Seidman's testimony was corroborated on many points by the testimony of Dr. Rachel Klein, the defendant's expert. Dr. Klein is the Director of Clinical Psy-chology at the New York State Psychiatric Institute and the Columbia Presbyterian Medical Center and a Professor of Clinical Psychology at Columbia University. Dr. Klein wrote most of the section on ADHD in the DSM-4.

Dr. Klein agreed that Nicholas has ADHD, and that from the very beginning Nicholas had difficulty conforming to the task demands of the school: he didn't pay as much attention as his teachers thought he should; he was not well organized in his written material; and he consistently did not perform up to his ability. Dr. Klein observed that, typical of youngsters with ADHD, Nicholas has a chronic problem of not handing in assignments on time and, when he does hand them in, they are not of the quality that is expected. Nicholas also has a very severe problem with procrastination, Dr. Klein observed. Essentially, she concurred with Dr. Seidman's summary of Nicholas' problems resulting from his ADHD: Nicholas has major problems in organization and time management, and he has developed a disaffected attitude towards the necessity of performing his work on time and in a manner that meets the requirements of the school.

Dr. Klein also testified that ADHD is associated with Nicholas' lack of effort in school and in his inability to honestly assess his problems. Dr. Klein testified that regardless of whether one has ADHD or not, individuals fail to apply themselves as well to tasks that are difficult for them. Nicholas finds it difficult to concentrate, organize his work, and focus on the task at hand; therefore, he tends not to perform such tasks. Because Nicholas has difficulty performing, he ends up not trying very hard. Moreover, because he is constantly failing to meet the academic requirements, he attempts to justify that pattern of behavior. Dr. Klein testified that "youngsters with ADHD are very poor at identifying what is the problem and pinpointing what gets in their way, so that they tend to blame others if they can't do something.

They don't see themselves as contributing to their difficulties, typically."

Dr. Klein testified, and the Court accepts, that medication was the key to treating Nicholas' ADHD: "When the medications are effective, they enable the person to do the task he or she wants to do. It doesn't lead the person to do things that they are not interested in or have no investment in, but if they decide that this is something they want to get done and try to do it, the medication will greatly facilitate their ability to do so."

The testimony of Dr. Keller, Phillips Academy's resident doctor, indicates that Ms. Axelrod took responsibility for Nicholas' medication and that the school was not involved at all in prescribing or administering Nicholas' medication.

### Junior Year (1997–1998)

Nicholas returned to Phillips Academy in the Fall of 1997 on Academic Restriction and No Excuse. Based on Dr. Seidman's diagnosis of ADHD, Ms. Axelrod asked for certain accommodations. Ms. Axelrod requested a foreign language waiver. Phillips Academy granted this request—this was only the third foreign language waiver request granted in twenty years. Ms. Axelrod also asked for a math waiver, which the school did not grant because Dr. Seidman's report did not indicate that Nicholas had a learning disability in math. In addition, Phillips Academy sent a letter to all of Nicholas' teachers stating that Nicholas had "specific learning differences" that entitled him to certain accommodations, including additional time on tests—although Nicholas did not need nor request such extra time. Ms. Brother sent a memorandum to Nicholas indicating that his teachers had been informed that he was entitled to special accommodations: "A notice has been sent to your teachers explaining that you have a documented learning difference and stating that *you will speak to them* if you require a special accommodation in their class." (emphasis in original)

During Nicholas' Junior year, Ms. Brother again offered to assist Nicholas in developing sound study skills. Ms. Brother scheduled appointments to meet with Nicholas, but Nicholas showed up for only the first and fourth appointments.

Nicholas' academic performance improved in the Fall Term, and he was removed from No Excuse at the end of the first trimester. Despite a promising Fall Term, Nicholas' performance declined during the Winter Term. Nicholas earned "2"s—minimum pass—in math and history. During the Winter Term, Phillips Academy offered Nicholas the assistance of a peer tutor for math. Peer tutors are upperclass students who are chosen by the faculty because they have excelled in a subject. Peer tutors are available to meet up to ninety minutes per week to assist with homework. Ms. Elizabeth Schoenherr, the Assistant Director of Academic Counseling and head of the peer tutoring program, assigned Melissa Sullivan to tutor Nicholas. Nicholas testified at trial that Ms. Sullivan did not appear for the tutoring sessions because of her sports commitments. Ms. Sullivan's deposition testimony indicates, and the court accepts, that Nicholas only showed up for *one* session. Ms. Sullivan said, and the Court accepts, that she rescheduled one or two sessions because of her sports schedule, and that Nicholas confirmed via voicemail that he would attend, but that he did not meet with Ms. Sullivan and never called her to cancel the appointment.

In the Spring Term, Nicholas was on No Excuse at midterm when he earned failing grades, coupled with unsatisfactory effort grades, in math and history; Nicholas failed math for the trimester. The math instructor's report states, "... Nick has always struggled to pay enough attention and do enough work to get by in math.... Nick completed very few homework assignments.... I often caught Nick wasting time—playing games on his calculator at best, and actively distracting his peers at worst."

Because of Nicholas' low grade in math during the Winter Term, Ms. Schoenherr offered to personally tutor Nicholas one-on-one in Math 34 during the Spring Term. Ms. Schoenherr blocked out time on her calendar to meet with Nicholas three times a week for a forty-five minute session each time. Nicholas went to only seven or eight of the approximately twenty-five sessions. Ms. Schoenherr testified that, unlike the other students whom she tutored in math, Nicholas understood the concepts; Nicholas' problem was that he failed to do the assigned problems every night. Nicholas testified that he did not find these sessions helpful and that Ms. Schoenherr told him that she was not comfortable tutoring Math 34. The Court does not believe that Ms. Schoenherr ever told Nicholas that she was uncomfortable tutoring Math 34. In fact, she was tutoring three other students in Math 34 during that same term.

Based on his academic performance in the Spring Term, the full faculty of Phillips Academy voted in June 1998 to place Nicholas on General Warning and No Excuse, and to formally advise Nicholas to withdraw. Mr. Merrill, Nicholas' House Counselor, wrote to Ms. Axelrod urging her to withdraw Nicholas:

> Our decision stems from long-term concerns that the requirements and expectations of the school and the pace of the academic life here seem not to mesh with Nick's strengths. He is clearly a talented student in some courses and some formats.... As things stand, however, Nick is too often unprepared and late with assignments, misses too many classes, and regularly fails to meet expectations in virtually every course.... I am troubled most by what I see as Nick's inability to be honest with himself about his behavior and the hurdles facing him.... In sum, we believe that Phillips Academy is a demonstrably inappropriate school for Nick.

Although Nicholas was allowed to return for his senior year, he did so under the express condition that he meet the requirements outlined in his General Warning letter. In relevant part, the General Warning letter reads:

> General Warning gives you one term in which to prove that you can succeed at Andover. Your academic record would be reviewed at the end of the term. We would be looking for a significant improvement in your academic performance. If your academic record is good, you would be removed from General Warning. On the other hand, if you are overcut (5 or more unexcused absences), have one or more unsatisfactory effort grades, or fail one or more courses, you would be dismissed from Phillips Academy. While on General Warning, you must earn positive reports from all your teachers and counselors, and post an academic record indicative both of your ability and of a serious commitment to each of your courses. *Your instructors' reports will need to reflect that you have completed your assignments regularly and on time, that you have submitted all required work and that you have been responsible in meeting all of your appointments including extra help sessions.* (emphasis in original)

### Senior Year (1998–1999)

In the Fall Term, Nicholas took four classes, including Rel/Phil 46 ("Biomedical Ethics"), which was taught by Dianne Moore. The class is an elective, and it was a very small class even for Phillips Academy, having only eight students. The goals of this class were to acquaint students with current issues in biomedical ethics, teach students to recognize the moral dilemmas involved in these issues, and to help students articulate their views on these issues. The first part of the term was devoted to studying theory, reading about current issues, writing position papers, and debating the issues. The second part of the term was devoted to writing a final paper on a topic of the student's choice.

The final paper was due on December 4; however, the final paper was broken into smaller sections and the students were required to submit their work-to-date at several intervals so that Ms. Moore could review the work and comment on the student's progress:

October 3: topic

October 16: bibliography (1st draft)

November 9: bibliography (2nd draft), introduction (1st draft)

November 21: bibliography (3rd draft), introduction (2nd draft), outline (1st draft)

November 23: bibliography (4th draft), introduction (3rd draft), outline (2nd draft)

December 4: final paper

As of the midterm, October 26, Nicholas was performing satisfactorily in Ms. Moore's class. Nicholas was not faring so well in his other classes, however; Nicholas received three "D" grades, a "D" indicating that the student is in danger of failing the class. Linda Carter–Griffith, Nicholas' cluster dean, wrote Nicholas about his midterm grades:

> . . . your record is dismal and your instructors' reports are discouraging . . . . if your record were to be reviewed right now, you would be dismissed from Phillips Academy . . . . you are still unable *or* unwilling to focus on your schoolwork and you seem to prefer to spend your time on the telephone with your girlfriend or at the computer, playing games.

Mr. Merrill, testified that the amount of time Nicholas was spending on computer games and the phone was impacting his academics. Mr. Merrill's testimony is bolstered by Nicholas' phone records, which indicate that in October, he spent 360 hours—12 hours a day—on the phone or logged on to the internet.

Although at midterm Nicholas was performing satisfactorily in Biomedical Ethics, his subsequent work was poor and, on November 4, Ms. Moore warned Nicholas that he was in danger of getting a "U." The Blue Book outlines the significance of the "U" grade: "The letter U (Unsatisfactory) may be used with any grade to indicate a persistent pattern of behavior in which a student is frequently unprepared for class, disruptive or inattentive, late, absent, or late in handing in assignments." Ms. Moore testified that Nicholas was in danger of getting a "U" because his third position paper was "woefully inadequate" (Nicholas admitted to Ms. Moore that his third position paper was "awful"); he was not incorporating the assigned readings into his papers; he was not prepared for class presentations; and he failed to turn in an outline for a reading assignment. Ms. Moore warned Nicholas that he would get a "U" unless he incorporated the readings into his papers, was prepared for class presentations, and turned in all assignments on time. Nicholas testified that at this November 4 meeting he asked Ms. Moore for a written syllabus, detailing the remaining due dates, for the class assignments. Ms. Moore testified that she never received such a request. The Court accepts Ms. Moore's testimony.

On November 9, Nicholas failed to turn in his revised bibliography. Ms. Moore reminded Nicholas that the revised bibliography was due and told him that she was especially concerned because his first bibliography was so poor. Nicholas said that he was working on the bibliography and that he would get it to her. Ms. Moore had two or three conversations with Nicholas about the second draft of his bibliography, but Nicholas never turned it in.

On November 21, Nicholas was supposed to bring his bibliography (3rd draft), introduction (2nd draft), and the outline of the remainder of the paper (1st draft) to class. This class was to be a peer review session, a session at which the students reviewed and commented on each other's papers. Nicholas arrived at class with no paper. When asked about his paper, Nicholas said that it was not yet finished. Ms.

Moore explained that she did not expect a finished paper; rather, Nicholas was supposed to bring his work-to-date. Because the students were to review the drafts in class, Ms. Moore encouraged Nicholas to leave class, go to his dorm, and return with whatever he had completed. Nicholas again stated that he had not finished the paper, shrugged his shoulders, and remained in class. Nicholas testified at trial that he went back to his dorm after class, worked on his paper for about half an hour, and then turned in his paper to Ms. Moore. The Court finds his testimony to be untrue. Ms. Moore testified, and the Court accepts, that Nicholas never turned in any parts of his paper on November 21. No paper was even due to be turned in on this date; only a peer review session was to be held during class.

At the conclusion of class, Ms. Moore told Nicholas that he had earned a "U" for her class, because, after already receiving the "U" warning on November 4, Nicholas failed to turn in the second draft of his bibliography on November 9 and had nothing prepared for the November 21 peer review session. Ms. Moore told Nicholas that she hoped he would rally for the remainder of the trimester so that she could provide a positive comment on his record that might mitigate the effect of the "U." On November 23, Ms. Moore sent Nicholas a letter summarizing their November 21st conversation and formally advising Nicholas that he would receive a "U."

On November 23, students were supposed to submit their bibliography (4th draft), introduction (3rd draft), and outline (2nd draft). The November 23 drafts were supposed to incorporate the comments from the in-class peer review session on November 21. There was no class on November 23 so papers were due in Ms. Moore's mailbox at 9 a.m. on the 23rd. Ms. Moore wanted the papers at 9 a.m. so that she could review them during the day and return them to the students the next day before they left for the Thanksgiving

holiday break. Ms. Moore checked her box at 9:30 a.m. and found papers from the other seven students. She checked her box again at noon and at 3:30 p.m. Nicholas' paper was not in her box at 3:30 p.m. when she left the school for the day.

On November 24, Ms. Moore returned the papers she had received with her comments thereon. When Ms. Moore asked Nicholas where his paper was, Nicholas told her that he had turned in his paper after 3:30 p.m. on the previous day. Ms. Moore checked her box thirty minutes after class and found Nicholas' paper, although it did not include a bibliography or an outline for the remainder of the paper as required. Ms. Moore did not have time to review his paper before Nicholas left for the Thanksgiving holiday break; however, she returned Nicholas' paper on December 2, the next class date. At trial the plaintiffs suggested that Ms. Moore should have mailed or faxed Nicholas' paper to him over the holiday period, however, the Court finds that Nicholas never made such a request of Ms. Moore.

Classtime on December 2nd was devoted to another peer review session. Ms. Moore met with Nicholas during class. During this meeting, Nicholas stated that he understood Ms. Moore's comments on his paper, and he expressed confidence in his paper. After class, Nicholas asked Ms. Moore if the "U" would stand, and she said it would. Nicholas protested the "U," but agreed with all of the factual allegations contained in the November 23 letter. Nicholas then told Ms. Moore that he was on General Warning and that he had ADHD. Ms. Moore testified that she knew Nicholas was on academic restriction but that she was unaware of its terms. Ms. Moore was never explicitly told by Phillips Academy that Nicholas had ADHD. She had, however, received the memorandum stating that Nicholas had "learning differences," and she had assumed that Nicholas had ADHD. Nicholas told Ms. Moore that his ADHD affected his ability to perform in her class. Ms. Moore told Nicholas that

his "U" was not the result of his ADHD, but of his not turning in his written assignments as she had required.

Ms. Moore was in her office on December 3 in the event any student wished to discuss his paper, which two other students did. On December 4, Nicholas turned in his final paper. The final paper did not incorporate the explicit editing corrections and comments that Ms. Moore had made on the prior draft. Moreover, the bibliography did not include sources that Ms. Moore had told Nicholas to use, and the substance of the paper was weak. Nicholas earned a "2" for the paper and a "2U" for the class.

By earning à "U" effort grade in Biomedical Ethics, Nicholas violated a condition of his General Warning. Nicholas had other academic problems as well: he earned a "2" in Cosmology, he failed to turn in assignments on time in other classes, and his teacher comments were generally not positive. Nicholas' cumulative trimester grade average was a 3.0, with only two students receiving lower grades. On December 16, 1998, the full faculty of Phillips Academy voted 168–2, with 6 abstentions, to require Nicholas to withdraw.

In deciding whether they should require Nicholas to withdraw, members of the faculty considered Nicholas' instructor reports, grades, the recommendation of the cluster faculty, the General Warning letter requirements, and his house counselor reports. At the full faculty meeting several of Nicholas' teachers, house counselors, and academic counselors spoke. Kevin Driscoll, Nicholas' House Counselor, presented the recommendation of the faculty of Nicholas' cluster, which was to require withdrawal. Dr. Max Olovisetti spoke on Nicholas' behalf at both the cluster meeting and at the full faculty meeting. Dr. Olovisetti explained that Nicholas had ADHD, and at the cluster meeting he read excepts of a letter prepared by Dr. Seidman, which explained how Nicholas' difficulties at Phillips Academy may be associated with his ADHD and the adverse effect Nicholas' withdrawal would have on him. Although the faculty was apprised of Nicholas' ADHD and the accommodations the school had made, there is no evidence that the faculty voted to require Nicholas to withdraw because of his ADHD.

On December 21, 1998, Linda Carter–Griffith, Dean of the Pine Knoll Cluster, sent Nicholas a letter informing him of the faculty's decision. It stated the reasons for requiring him to withdraw:

The full faculty in its Fall Term rating meeting voted almost unanimously to take this action because you did not meet the terms of General Warning that were clearly spelled out for you in late June and then again at the Fall Midterm in late October. You earned a grade of '2' with Unsatisfactory Effort in Rel/Phil 46, a grade of '2' in your Cosmology class and your instructor reports were mostly less than positive. We gave your situation a great deal of discussion; however, given your long history of academic difficulty here, the faculty were of the opinion that your interests would be better served by completing your high school education in a less demanding academic environment.

Nicholas and Ms. Axelrod then brought this present action seeking to reverse the faculty's decision and to reinstate Nicholas at Phillips Academy.

*Title III of the ADA*

■ Title III of the ADA states, in relevant part, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation...." Phillips Academy, a private college preparatory school, is a place of public accommodation to which Title III applies. *See Bercovitch v. Baldwin School,* 133 F.3d 141, 153 (1st Cir. 1998).

■ To prevail on their ADA Title III claim, the plaintiffs must show: (1) Nicholas is disabled within the meaning of the ADA; (2) he is otherwise qualified for participation in the program; (3) he made a request for a reasonable accommodation; and (4) Phillips Academy denied the request. *Bercovitch,* 133 F.3d at 154; *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 795 (1st Cir.1992); *Johnson v. Gambrinus Company/Spoetzl Brewery,* 116 F.3d 1052, 1059 (5th Cir. 1997). For the reasons below, the Court finds that, even with reasonable accommodation, Nicholas was not otherwise qualified to remain at Phillips Academy.

### Disability

■ The Court accepts the testimony of Dr. Seidman and Dr. Klein that Nicholas has ADHD. ADHD can constitute a disability under the ADA. *Bercovitch,* 133 F.3d at 155. Because of the Court's resolution of the other issues in this case, the Court assumes, without deciding, that Nicholas is disabled for purposes of the ADA.

### Otherwise Qualified

■ The Court finds, however, that, even with reasonable accommodations, Nicholas is not otherwise qualified to continue at Phillips Academy. In order for Nicholas to be "otherwise qualified," he must prove that he is able to meet all of Phillips Academy's academic requirements *in spite of* his handicap. *Bercovitch,* 133 F.3d at 154. Because courts have neither the authority nor the expertise to prescribe academic standards, academic institutions have traditionally been given great latitude in establishing their curriculum, grading procedures, and academic standards. *See id.* at 153. Absent evidence that Phillips Academy's standards were motivated by an intent to discriminate against the disabled, the Court will not substitute its judgment for that of the faculty of Phillips Academy as to whether a given grade is appropriate or whether a

student's academic record warrants his dismissal. Here the Court finds no evidence of such discrimination. The evidence shows that Phillips Academy has many students with physical and psychological disabilities, including twenty-four other students with ADHD.

The Court finds instead that Nicholas was required to withdraw because of his poor overall academic record and his failure to meet the requirements of General Warning. Nicholas was explicitly told what he had to do in order to remain at Phillips Academy, and he failed to perform as required.

Nicholas' ADHD makes it more difficult for him to perform in school, and, as Dr. Klein testified, individuals tend to delay doing that which they find difficult. Undoubtedly, if Nicholas did not have ADHD, he would find it easier to organize his work, and this in turn would probably make it easier for him to settle down and do the work. Nicholas does have ADHD, however, and, thus, Nicholas will have to work harder to overcome his weakness in planning and organization. The ADA requires Phillips Academy to make reasonable accommodations to assist students to perform, but, ultimately, a student is responsible for doing his work. Nicholas did not perform the required school work, and Phillips Academy, appropriately, held him accountable.

At trial, plaintiffs argued that other students with worse academic records than Nicholas' were allowed to graduate from Phillips Academy. This argument is factually unsupportable and legally irrelevant. The evidence shows that none of the students who were allowed to remain at Phillips Academy and to graduate had worse academic records than Nicholas. Some students had failed more classes than Nicholas, some had more "U"s, and some had even violated the terms of General Warning and been allowed to remain. However, no student had a longer, more sustained, record of academic under-performance than Nicholas. More important-

ly, however, this case is not about whether Phillips Academy correctly assessed Nicholas' ability to meet its academic requirements, but, rather, whether Phillips Academy discriminated against Nicholas on the basis of his ADHD.

### Reasonable Accommodations

 Phillips Academy is required under the ADA to make reasonable accommodations for a student's disability. However, the onus is on the student, or the student's parent, to request such accommodations from the school. *See Wynne,* 976 F.2d at 795; *Gambrinus Company/Spoetzl Brewery,* 116 F.3d at 1059. Here, the evidence indicates that only two accommodations were requested: a foreign language waiver, which was granted, and a math waiver, which was not. The Court finds that a math waiver was not reasonable because there was no documentation evidencing a math learning disability. Moreover, Nicholas did well in math in junior high school, and scored a 640 out of 800 on the math section of the SAT (88th percentile) (Nicholas had an overall score of 1410 out of 1600 without seeking any additional time to complete the test.). In addition, Phillips Academy considers three years of math to be a core requirement, and has never granted a math waiver. Finally, although Nicholas did fail several math classes, he was ultimately required to withdraw from Phillips Academy for his academic performance in the 1998 Fall Term, a term in which he was taking no math classes and only elective courses.

 At trial, the plaintiffs suggested several additional steps that Phillips Academy could have taken to accommodate Nicholas' ADHD (set up a team to monitor Nicholas' school work, provide a written syllabus for Ms. Moore's class, grant extensions for papers, and inform Nicholas' teachers specifically that Nicholas had ADHD), but Nicholas and Ms. Axelrod never requested these accommodations of Phillips Academy while Nicholas was enrolled. The burden is not on the school to establish that there was nothing else it could have done to help Nicholas to graduate, rather, the burden is on the plaintiffs to show that they requested a reasonable accommodation and the school denied it. *See Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 795 (1st Cir.1992); *Johnson v. Gambrinus Company/Spoetzl Brewery,* 116 F.3d 1052, 1059 (5th Cir. 1997). Here, there is no evidence that any accommodation, other than the math waiver, was requested and denied.

 During trial, plaintiffs argued that Dr. Seidman's report, which lists several changes that should be made to Nicholas' learning environment, constitutes a request for an accommodation to which Phillips Academy was obligated to respond. The Court finds that Dr. Seidman's report, which was sent to Phillips Academy, does not constitute a request for an accommodation. Dr. Seidman's report would certainly document and support a request for an accommodation. By itself, however, it does not constitute such a request. First, the evidence indicates that students do not always request all of the accommodations that their doctors believe they might be entitled to, thus, the mere fact a doctor suggests an accommodation does not mean that the student or parent wants such an accommodation to be made. Rather, the student and parent are in the best position to determine what accommodations the student needs. Second, Dr. Seidman's report does not differentiate between those accommodations that the school should make, those that the parent should make, and those that Nicholas should make. It would be unfair to hold Phillips Academy responsible for changing that which it has little control over.

Even though the Court does not find that Dr. Seidman's report constitutes a request for an accommodation, the Court desires to make it clear that Phillips Academy and Ms. Moore made many, if not all, of the accommodations that Dr. Seidman's report recommended.

1. *One-on-one instruction whenever possible:* Phillips Academy repeatedly offered Nicholas tutoring, which he did not take advantage of—peer tutoring for math, math tutoring with Ms. Schoenherr, study skills tutoring, and teachers who were available outside the classroom.

2. *Regularly scheduled study time, rather than last minute cramming:* Phillips Academy has established a regular study period for all students, beginning at 8 p.m. on evenings preceding class days.

3. *Breaking larger projects into smaller projects:* Dr. Klein testified that she found Ms. Moore's class to be an excellent example of distributed learning. The final paper in Ms. Moore's class was broken into several smaller assignments.

4. *Pairing interesting tasks with those that are less interesting:* Phillips Academy allowed Nicholas to take only electives in the Fall 1998 term. Presumably, all of Nicholas' classes interested him. However, the Court believes that only Nicholas could determine which assignments were interesting, which were less interesting, and, accordingly, which assignments should be paired together. This technique, however, was one that Phillips Academy taught as part of their Study Skills course, which Nicholas was offered.

5. *A distraction-free study environment:* Mr. Merrill told Nicholas and Ms. Axelrod on several occasions that the house staff believed that Nicholas' telephone and computer were adversely impacting his studying. Both Nicholas and Ms. Axelrod ignored the house staff recommendations. Dean Carter–Griffith also offered her home to Nicholas as a quiet place to study. Nicholas declined her offer, and testified at trial that he studied best in his own room.

6. *Being flexible with goals, recognizing there will be periods of resistance to work:* Ms. Moore was flexible. She moved one deadline for the whole class. She told Nicholas to turn in what he had done to-date. She offered to let him leave class to go get his paper.

7. *Immediate feedback on school assignments:* The purpose of this recommendation was to help ensure that Nicholas had mastered the old material before moving on to the new. Ms. Moore structured the final paper in such a way that she could comment on the early drafts so that her comments could be considered and incorporated in the later drafts. Nicholas did not turn in many of the drafts, however, and he failed to incorporate the comments Ms. Moore did make.

8. *Untimed tests:* Phillips Academy sent a notice to all of Nicholas' teachers, informing them that Nicholas was entitled to additional time on exams. Nicholas, however, never requested additional time. Nicholas was also granted additional time to take the SAT, but he refused it.

9. *A waiver of the foreign language requirement:* Phillips Academy granted Nicholas a waiver, only the third such waiver in twenty years.

The Court is at a loss to imagine any additional reasonable accommodation that Phillips Academy could have made so that Nicholas could have remained in school. Nicholas was required to withdraw because he violated the terms of General Warning. Nicholas was allowed to return for his senior year on the express condition that he do so on General Warning. The Court does not believe that it would be a reasonable accommodation for the school to simply ignore the fact that Nicholas did not meet the terms of General Warning.

Nor does the Court think that Phillips Academy could have made any reasonable accommodations to ensure that Nicholas did not violate the terms of General Warning. Nicholas violated the terms of General Warning by earning a grade of "2" with Unsatisfactory Effort in Biomedical Ethics, a grade of "2" in Cosmology class, and earning instructor reports that were mostly less than positive. The Court finds that Nicholas' grade of "U" in Ms. Moore's class was appropriate. Nicholas earned a "U" because he did not turn in written assignments on time, or at all. There is no reasonable accommodation that Phillips Academy can make to accommodate a student's failure to perform the work or to turn it in on time. The Court finds that Nicholas never asked for an extension of the due dates of his written assignments in Ms. Moore's class. Moreover, the Court accepts the testimony of Dr. Klein that giving an extension to a person who procrastinates is not an effective solution because the problem is not that the student needs more time—rather, it is that he is not organizing his time. Giving such a student more time is akin to giving somebody who is chronically late for appointments a later appointment—that person would still be late for his later appointment. The Court also finds that it would not have been reasonable to simply excuse Nicholas' failure to do the work.

## Conclusion

Ms. Axelrod testified "No one ever seemed to get it, or make any effort to get it.... To understand that Nick had ADHD and to understand what that means about his study habits." The Court understands that Nicholas has ADHD and that it affects his ability to learn. The Court also believes that the faculty members at Phillips Academy who testified at trial also have a good understanding of ADHD—many had attended seminars or courses on ADHD, many (including Ms. Moore) had taught students with ADHD, and some, such as Mr. Driscoll, had worked at schools that specialize in teaching learning disabled students. But the fact that Nicholas has ADHD is not a general excuse for Nicholas' failure to meet academic standards.

Currently, twenty-four students with ADHD attend Phillips Academy. Even with their ADHD, however, these students are meeting the academic requirements of the school. They may have to work harder than other students, but these students have found a way to succeed in spite of their ADHD. The fact that Nicholas has ADHD was never the determining factor as to whether he would succeed or fail at Phillips Academy. It was a factor, but not the determining one. Even with ADHD, Nicholas could have turned in his paper on time, he could have brought to class the work he had completed to date, and he could have incorporated Ms. Moore's grammatical corrections and substantive suggestions in his paper.

What a devastating message the Court would send to academia if it were to re-admit Nicholas in spite of his failure to do the assigned work. Teachers would be reluctant to set standards and give honest grades for fear of being hauled into court. Students would learn that effort and achievement is less important than a handy excuse.

For the past three years, Phillips Academy has been attempting to tell Nicholas and his mother that Phillips Academy was not a good choice for Nicholas, not because of his ADHD, but because of Nicholas' failure to meet the academic standards of the school. Despite increasingly dire warnings from the school, Ms. Axelrod continued to enroll Nicholas there. Now, in what would have been Nicholas' final term, the Court must rule that Nicholas will not graduate this year and will not attend college next fall. This is an unfortunate result, but it is the one necessitated by the plaintiffs' unwillingness to listen to the clear message Phillips Academy has been sending them for the past three years.

Nicholas Panagopoulos is a bright, articulate, and talented young man; but, he needs to learn that he is accountable for his conduct, disability or no disability. The Court is confident that when he does so, he will realize all of the potential that his past teachers, his mother, and this Court believe he possesses.

In the Court's Memorandum of February 17, 1999 relating to its issuance of a preliminary injunction in this case, the Court stated "... a teacher of a high school student, especially of a student who boards at school away from his parents, is placed in relation to that student *in loco parentis* and must be vigilant in seeing that the rights of the student placed in her charge are fully respected." Phillips Academy was vigilant in insuring that Nicholas Panagopoulos' rights were fully respected.