2008 VT 76

## Dr. Rajan D. Bhatt v. The University of Vermont

[958 A.2d 637]

No. 07-038

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 30, 2008

*John L. Franco, Jr.,* Burlington, for Plaintiff-Appellant.

*Jeffrey J. Nolan* and *Amy M. McLaughlin* of *Dinse, Knapp & McAndrew, P.C.,* Burlington, for Defendant-Appellee.

¶ 1. **Dooley, J.** Plaintiff Dr. Rajan Bhatt appeals from a decision of the Chittenden Superior Court, granting summary judgment to

defendant The University of Vermont (the University) on plaintiff's claim that he was subjected to discrimination because of his disability. On appeal, plaintiff argues that: (1) the Vermont Public Accommodations Act, 9 V.S.A. §§ 4500-4507 (VPAA), requires accommodation of disability-based misconduct not caused by drug or alcohol abuse; (2) the University did not adequately consider measures that might have accommodated plaintiff's disability; and (3) the court's conclusion that plaintiff posed a direct threat of harm was procedurally defective and not authorized under the statute. We affirm.

¶ 2. The facts of this case are entirely contained in a stipulation to which the parties agreed for the purpose of presenting defendant's motion for summary judgment. In the spring of 1999, when plaintiff was in his fourth year at the University's College of Medicine (the College), a faculty member discovered that plaintiff had falsified an evaluation for a pediatric-surgery rotation, falsely claiming to have completed such a rotation at another medical school. The College accordingly convened a hearing of the Committee on Fitness (the Committee) to review the accusations against plaintiff. The regulations applied by the Committee stated in pertinent part that "a student whose behavior is considered to render him/her unfit for a career in medicine may be dismissed at any time from the College of Medicine. Such behavior includes, but is not limited to, demonstrated poor judgment, lack of personal integrity, [or] lack of personal accountability."

¶ 3. During the hearing, plaintiff admitted that he had submitted a false evaluation but maintained that this was an isolated incident. In particular, plaintiff insisted that he had accurately represented his other qualifications, including the magna cum laude credential received from his undergraduate institution. In a decision dated April 1, 1999, the Committee informed plaintiff that, while his offense was severe enough to warrant dismissal, the Committee had chosen to impose less serious sanctions, including postponement of graduation, monitoring, and inclusion of the incident in plaintiff's record.

¶ 4. Later, however, the College discovered that plaintiff had also falsified evaluations for two other surgical rotations at other medical schools that he had never, in fact, completed. In addition, the College discovered that plaintiff had falsely represented that he had graduated magna cum laude from his undergraduate institution and had altered his diploma to support his misrepre-

sentation. The Committee further discovered that, in the middle of the original hearing, plaintiff had phoned the admissions office of his undergraduate university and impersonated an employee of that institution in order to create the impression that he had graduated magna cum laude.

¶ 5. The College then convened a second hearing. At the hearing, plaintiff acknowledged having made the false representations of which he was accused but asserted that all of his misconduct was caused by Tourette's Syndrome and a related obsessive-behavior disorder from which he suffered. Plaintiff claimed that "stressors he endured during two particular University rotations triggered his behavior," incidents plaintiff now argues involved racially hostile remarks made by other students and faculty at the College.[1] Plaintiff provided expert testimony to establish the existence and nature of his disability[2] and argued, on the basis of that disability, that sanctions less severe than dismissal were proper.

¶ 6. Nonetheless, in a later decision dated May 13, 1999, the Committee voted to dismiss plaintiff from the University. Plaintiff appealed this decision to the Dean of the College, John Frymoyer, M.D., who rejected that request on June 17, 1999. Dr. Frymoyer's written appeal decision stated in pertinent part:

> Underlying your appeal is your statement that you have "Tourette's Syndrome with associated tics, impulsivity and obsessive compulsive disorders." . . . For the purpose of argument only, I will assume you have a disability as defined by law and the disability includes uncontrollable impulsiveness and obsessive compulsive behaviors.

> You provided no evidence that you requested an accommodation . . . before [any] discoveries [of the fraud]

---

[1] Plaintiff alleged in his complaint that the University engaged in racial discrimination in violation of 9 V.S.A. § 4502(a). Apparently, plaintiff has abandoned this independent claim and refers to these allegations only to allege that he reacted to these provocations in the manner he did because of his disability. In any event, this independent claim has not been raised on appeal.

[2] The University disputes whether plaintiff's disability was a legal cause of the conduct for which he was disciplined. Because of its summary judgment decision, the superior court did not reach this issue, which would require a trial. Because plaintiff does not ask us to do so, we also decline to reach the issue.

. . . . Finally, although it was clear at the time of the first hearing on March 31, 1999 that you had been "caught" engaging in deceitful behaviors, and accordingly faced dismissal, you did not at that time assert that your behaviors had perhaps been caused by your disability. By failing . . . to request an accommodation, you accepted any consequence, positive or negative, emanating from your actions.

. . . .

You argue the sanction against you should be something less than dismissal, because, again continuing the assumptions I have been making, your disability caused and/or contributed to your actions and should be viewed as a mitigating factor. There is no evidence the Committee failed to consider issues of disability and the testimony regarding Tourette's Syndrome, not all of which seems to support your contentions . . . . I would note that even assuming you have a disability, there is still sufficient evidence in the record to support dismissal rather than other sanctions. Deception, dishonesty and perpetration of fraud are absolutely unacceptable, irrespective of cause.

¶ 7. Plaintiff then began seeking treatment for his disability and contacted the Dean approximately six months later, providing the contact information of his treating physicians and requesting that the Dean speak to them about plaintiff's improved medical condition. The Dean directed plaintiff to reapply for admission to the University, and plaintiff duly did so in February 2000, requesting reinstatement to the class graduating in 2001 or transfer and advanced standing at the University. That request was denied in writing on June 26, 2000.

¶ 8. Thereafter, plaintiff continued pursuing a medical degree, this time at a Massachusetts branch of the University of St. Eustatius School of Medicine. Plaintiff completed those studies and entered into a residency program at The University of Arizona in 2003. However, because plaintiff's degree is not recognized in every state and limits where he can practice medicine, plaintiff instituted the present action in November 2004, seeking equitable relief, including the award of his degree or reinstatement to the College in order to obtain his degree.

¶ 9. In October 2006, when discovery was still ongoing, defendant moved for summary judgment, arguing: (1) misconduct caused by a disability may be sanctioned under VPAA, even where the misconduct is unrelated to drug or alcohol abuse; and (2) plaintiff was not "otherwise qualified" to attend the College and was not, therefore, entitled to the protections of VPAA. On December 22, 2006, the trial court granted defendant's motion. First, the court addressed whether plaintiff met the "essential eligibility requirements" reasonably imposed by the College. Relying on federal case law, the court reasoned that "medical schools are not required to alter their policies or programs in such a way as would compromise the integrity of their programs." The court bolstered this conclusion by emphasizing that the court should generally "defer to an academic institution's professional judgment of the competency required for award of an academic degree." The court thus concluded that plaintiff did not meet the essential eligibility requirements of the medical program:

> The College, hospitals, and a student's patients must all be able to trust the student to . . . maintain confidentiality, give candid advice, obey regulations regarding controlled substances, and be forthcoming, even if it means disclosing her own errors. We would defer to [the University's] judgment in imposing this graduation requirement even if we did not agree it was sound.

¶ 10. In the alternative, the court concluded, summary judgment against plaintiff was proper because the accommodation he requested would be "an 'unreasonable' modification as a matter of law." This was so, the court stated, because granting plaintiff's requested relief "would undermine the justification for the privileges inherent in a medical degree."

¶ 11. Finally, the court concluded that summary judgment was proper because "plaintiff would put the public at a risk of harm." The court found reasonable the Dean's conclusion that plaintiff posed an unreasonable risk of harm to his patients and concluded that "VPAA will no more obligate [the University] to sanction [plaintiff's] care of patients than it would require a bus company to hire a blind driver." Accordingly, the court granted summary judgment to defendant. This appeal followed.

¶ 12. Summary judgment is mandated where, after the relevant period for discovery, a party " 'fails to make a showing sufficient

to establish the existence of an element' essential to his case on which he has the burden of proof at trial." *Poplaski v. Lamphere*, 152 Vt. 251, 254-55, 565 A.2d 1326, 1329 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). We review an award of summary judgment de novo, construing all doubts and inferences in favor of the nonmoving party. *In re Mayo Health Care, Inc.*, 2003 VT 69, ¶ 3, 175 Vt. 605, 830 A.2d 129 (mem.).

¶ 13. Plaintiff claims that the University's failure to readmit him as requested violated VPAA, because the University is a place of public accommodation, see 9 V.S.A. § 4501(1) (place of public accommodation means "any school"), which is prohibited from excluding him "from . . . services . . . on the basis of his or her disability." *Id.* § 4502(c). Specifically, plaintiff claims that the University violated § 4502(c)(5) which provides:

> A public accommodation shall make reasonable modifications in policies, practices or procedures when those modifications are necessary to offer goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages or accommodations.

¶ 14. This language is taken from Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182(b)(2)(A)(ii). Our Legislature's adoption of identical language in VPAA is "not intended to impose additional or higher standards, duties or requirements than that act." 9 V.S.A. § 4500(a); see also *Dep't of Corr. v. Human Rights Comm'n*, 2006 VT 134, ¶ 9, 181 Vt. 225, 917 A.2d 451. To make out a claim under § 12182(b)(2)(A)(ii), a plaintiff must show that: (1) he or she is disabled; (2) the defendant is a place of public accommodation; and (3) the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006).[3]

---

[3] In the context of the ADA, a Title III requirement applies only if the defendant is not a public entity. See *Mershon*, 442 F.3d at 1076 (defendant must be a private entity). Under VPAA, by contrast, the obligations of a public accommodation apply

¶ 15. Before we apply the standard to this case, we make three contextual observations. First, we recognize that we are dealing with the decisions of an academic institution about the ethical and academic standards applicable to its students. We accord deference to the academic institution in making these judgments. See *Falcone v. Univ. of Minn.*, 388 F.3d 656, 659 (8th Cir. 2004) (university has "virtually unrestricted discretion to evaluate academic performance"); *Mershon*, 442 F.3d at 1078; *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047-48 (9th Cir. 1999); see generally *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 n.11 (1985) ("'University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.'" (quoting *Board of Curators v. Horowitz*, 435 U.S. 78, 96 n.6 (1978) (Powell, J., concurring))).

¶ 16. Second, the University in this case is acting for multiple purposes: to enforce academic standards, to protect patients being treated by students, to maintain trust between students and others, and to produce students who can go on to residencies and a profession practicing medicine. Thus, in his decision affirming plaintiff's dismissal, the Dean stated:

> My role as Dean compels me, among other things, to have the utmost regard for patient safety; to ensure students and faculty maintain a relationship of trust with their patients, peers, professors and mentors; and to ensure the College maintains good relationships with external entities that provide, and hopefully will continue to provide, clinical education for our students and to whom we make recommendations for graduating students' residency placements.

¶ 17. This statement is consistent with the College's ethical rules, which provide that "a student whose behavior is considered to render him/her unfit for a career in medicine may be dismissed at any time" and list examples of such behavior, including "lack of personal integrity [and] lack of personal accountability." We find these multiple goals and standards to be legitimate, indeed vital, to the operation of a medical school. The United States Supreme Court made a similar observation with respect to the nursing

both to public and private entities. See *Dep't of Corr.*, 2006 VT 134, ¶ 15. Thus, we need not decide whether the University is a public entity for purposes of the ADA.

program involved in *Southeastern Community College v. Davis*, 442 U.S. 397, 413 n.12 (1979), a Rehabilitation Act case involving a claim that an applicant was discriminated against because of her disability:

> Southeastern's program, structured to train persons who will be able to perform all normal roles of a registered nurse, represents a legitimate academic policy, and is accepted by the State. In effect, it seeks to ensure that no graduate will pose a danger to the public in any professional role in which he or she might be cast. Even if the licensing requirements of North Carolina or some other State are less demanding, nothing in the Act requires an educational institution to lower its standards.

Because of the relationship between the College standards and the ability of a graduate to practice medicine, this case takes on aspects that make it look as much like an employment-discrimination case as a student-dismissal case, and most of the precedents on which the parties rely come from employment-discrimination cases decided under the ADA. While we find those precedents helpful and cite them in support of our decision, we caution that this is a VPAA case, and one decided in the context of an academic institution.

¶ 18. Finally, and related to the discussion above, the majority of the briefing in this case addresses whether one precedential decision, *Kennedy v. Department of Public Safety*, 168 Vt. 601, 719 A.2d 405 (1998) (mem.), is determinative of the outcome. *Kennedy* is an employment-discrimination case decided under the Vermont Fair Employment Practices Act, 21 V.S.A. § 495(a)(1), and that difference alone gives us pause as to whether *Kennedy* could control this case under VPAA, which is an obviously different statutory scheme. The plaintiff in *Kennedy* was a state police officer who was convicted of DUI and found to have lied during the investigation of his conduct. For these reasons, he was fired, and he sued his employer alleging that he was disabled because of alcoholism and that his employer had punished him because of his disability. We rejected the claim on the following rationale:

> We join, however, the numerous federal courts of appeal that have held that under the Rehabilitation Act, adverse employment actions taken for misconduct are not dis-criminatory even though the employee was an alcoholic

and the misconduct was related to the misuse of alcohol. . . . Thus, we see no inference of discrimination in the alcohol-related misconduct charges that caused plaintiff's dismissal. In the absence of such an inference in the record, plaintiff has not made out a prima facie case sufficient to withstand a summary judgment motion.

*Id.* at 602, 719 A.2d at 406.

¶ 19. The University argues here that it was justified in dismissing plaintiff under *Kennedy* and therefore did not violate VPAA. Plaintiff responds that *Kennedy* applies only in cases of alcohol or drug abuse, which are separately treated under the ADA, and that, therefore, *Kennedy* did not justify his dismissal. See *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1086 (10th Cir. 1997). We note that the trial court did not cite or rely upon *Kennedy*. Emphasizing again that we are not dealing with an employment-discrimination case here, we choose not to resolve this appeal on the differing views of the reach of *Kennedy*, although we do draw on the principles underlying that decision. In saying this, we are not suggesting that *Kennedy* is not a viable precedent for employment-discrimination cases.

¶ 20. To prevail on his claim, plaintiff must establish that he is otherwise qualified to continue in medical school — that is, that he can meet its essential requirements with reasonable accommodation.[4] See *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998). Plaintiff also bears the burden of showing that he requested a reasonable accommodation. *Mershon*, 442 F.3d at 1077; *Axelrod v. Phillips Acad., Andover*, 46 F. Supp. 2d 72, 84 (D. Mass. 1999). Here, he has met neither burden.

¶ 21. It is important to stress the facts. This is a case of egregious misconduct. Plaintiff lied even in the hearing convened to determine whether he met academic requirements. He falsified documents. He tried to mislead his undergraduate institution into believing that his degree was as he had falsified it. He failed to meet academic requirements and tried to cover up the failure.

¶ 22. He went through two disciplinary hearings, but disclosed his disability claim only in the second and apparently only in seeking mitigation of punishment. He never requested that the

---

[4] To the extent the superior court decision is based on a conclusion that plaintiff presented "a direct threat to the health or safety of others," 9 V.S.A. § 4502(h), we do not reach that rationale.

College take any steps to accommodate his disability, at least prior to the disciplinary action. When he complained generally about racially hostile conduct addressed to him, he was encouraged to file a complaint through the proper channel and was told how to do so. He never filed such a complaint so that the College was not aware of the specific conduct or the perpetrator(s). Thus, the Dean concluded:

> You provided no evidence that you requested an accommodation for Tourette's Syndrome before Dr. Sproul's discoveries [of the fraud] . . . . Finally, although it was clear at the time of the first hearing on March 31, 1999 that you had been "caught" engaging in deceitful behaviors, and accordingly faced dismissal, you did not at that time assert that your behaviors had perhaps been caused by your disability. By failing to seek medical treatment or to request an accommodation, you accepted any consequences, positive or negative, emanating from your actions.

He went on to note that plaintiff raised his disability "as a mitigating factor" in determining the sanction, that the Committee had considered the situation as a whole — including the disability and the fact that plaintiff had already been given a second chance as a result of the first disciplinary hearing.

¶ 23. Plaintiff was dismissed during his fourth, and last, year of medical school. In his reapplication, he asked for readmission to the fourth year class. In his complaint, he sought either an award of his degree from the College or reinstatement with transfer of all previously earned credits, apparently referring to credits earned from St. Eustatius School of Medicine.

■ ¶ 24. For multiple reasons, we conclude on this record that the undisputed facts show that plaintiff lacks a prima facie case, and the superior court properly dismissed the action.[5] First, plaintiff cannot show that he met the essential qualifications for graduating from medical school, even with reasonable accommo-

---

[5] ADA claims are subject to the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In this case we rule that plaintiff has not established a prima facie case and do not reach the point at which the burden would shift. Moreover, there is no argument here that the College's rationale for dismissal was a pretext for discrimination.

dations. As the Dean emphasized, "[d]eception, dishonesty and perpetration of fraud are absolutely unacceptable, irrespective of cause." The College has the academic discretion to make honesty and personal accountability essential qualifications for its students. See *Falcone*, 388 F.3d at 659. As a matter of law, it would fundamentally alter the nature of the College if those actions by students were tolerated by the College and the student was allowed to enter the profession. See *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 793 (1st Cir. 1992) (where university reached the "rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty") (quotations omitted); *Doe v. Attorney Discipline Bd.*, 78 F.3d 584, 1996 WL 78312, at *3 (6th Cir. 1996) (unpublished table decision) (in bar discipline case under Title II of the ADA, "ADA does not require that we hold Doe to a lesser standard of conduct than any other attorney, it merely precludes Doe from being denied an opportunity to practice law because of his disability. Since Doe's disability . . . has precluded him from satisfying the most basic ethical requirements of his profession, he is not qualified under the provisions of the ADA.").

¶ 25. While in seeking readmission, plaintiff demonstrated that he had finally sought medical care and had made progress in addressing the conduct caused by his disability, the College was not required to accept this development as an answer to its decision to dismiss him. Providing medical care, whether as a student or a graduate, can create high-stress situations, and the circumstances that led to his conduct could well reoccur. The College has no guarantee that plaintiff will continue to seek medical treatment or that medical care will prevent a reoccurrence of misconduct.

¶ 26. Second, plaintiff never discharged his responsibility to seek an accommodation, if one exists. He raised his disability only in his second disciplinary hearing and then only in mitigation of punishment. As the Dean stated, "[b]y failing to seek medical treatment or to request an accommodation, [he] accepted any consequences, positive or negative, emanating from [his] actions."

¶ 27. Plaintiff argues that the College violated VPAA because it never considered any accommodation. This argument ignores plaintiff's initial burden to identify a need for an accommodation

and disclose it to the College. See *Kaltenberger*, 162 F.3d at 437. A reasonable accommodation is a prospective remedy. See *Office of Senate Sergeant at Arms v. Office of Senate Fair Employment Practices*, 95 F.3d 1102, 1107 (Fed. Cir. 1996). Its unrequested availability cannot · excuse past misconduct. See generally K. Timmons, *Accommodating Misconduct under the Americans with Disabilities Act*, 57 Fla. L. Rev. 187, 283 (2005). Requiring the student to raise the need for accommodation before the situation deteriorates to the point of misconduct encourages the student to seek diagnosis and treatment of a disability and to discuss the difficulty in complying with a conduct rule because of the disability. See *id.*

¶ 28. In this case, plaintiff might have had an argument if he had raised his disability and the need for an accommodation during or after the first disciplinary proceeding. His request, if any, was made after his dismissal and thus came far too late.

¶ 29. The third reason is related to the first two and highlights why this is not the type of situation that the ADA, and, by extension, VPAA, was intended to remedy. In essence, plaintiff seeks to wipe the slate clean and to obtain a second chance — in this case a third chance — to meet the academic and ethical requirements of the College. He has requested as a remedy that he be given a medical degree or that he be reinstated to the fourth year medical class. In essence, his record of misconduct would be eliminated, as if his disability was a full and complete defense to that misconduct. The College would be required to ignore that the misconduct, however egregious, ever occurred.

¶ 30. Decisions from other jurisdictions are clear, however, that the purpose of the ADA is not to give a second or third chance to one who commits misconduct. See *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666-67 (7th Cir. 1995) ("[Plaintiff] is not asking for an accommodation; he is not asking the Village to change anything. He is asking for another chance to allow *him* to change . . . . But the ADA does not require this."); *Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 131 (D.D.C. 2003) ("[employee] is not looking for an 'accommodation' under the ADA, but a complete pardon"); *Brundage v. Hahn*, 66 Cal. Rptr. 2d 830, 838 (Ct. App. 1997) (reasonable accommodation does not include "giving an employee a 'second chance' to control the disability in the future"); see also *Kaltenberger*, 162 F.3d at 437 (college not required to waive its policy against offering the retaking of failed

exams). While these are primarily employment-discrimination decisions, we see no reason why they would not apply in this context. If plaintiff's misconduct had been less serious and less related to the essential qualifications of a medical student or a practicing physician, he would have an argument that the purpose of the ADA is offended by applying a rationale to prevent a second chance after misconduct. See Timmons, *supra*, at 290. Such, however, is not the case here.

¶ 31. Finally, we note that plaintiff argues that the College cannot deny plaintiff an accommodation, because The University of Arizona is providing such an accommodation by allowing plaintiff to complete a residency there. The nature of any accommodation by The University of Arizona was undisclosed to the College, and so the College has not been able to respond to plaintiff's claim. We infer from plaintiff's argument that the accommodation extended by The University of Arizona was to ignore plaintiff's misconduct and the discipline the College imposed for that misconduct. This "accommodation" assumes that The University of Arizona knows of the College's action, a fact not provided in the stipulation. In any event, as we have already stated, the ADA does not require the College to provide such an "accommodation."

*Affirmed.*